4 F.3d 1543
 24 Envtl. L. Rep. 20,142
 COMMITTEE TO PRESERVE BOOMER LAKE PARK, an unincorporated
association, Plaintiff-Appellant,
v.
DEPARTMENT OF TRANSPORTATION, Samuel K. Skinner, Secretary
of the United States Department of Transportation;
Oklahoma Department of Transportation,
Defendants-Appellees.
 No. 92-6198.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 14, 1993.
 
 John R. Couch, Jr., Stillwater, OK, for plaintiff-appellant.
 Katherine L. Adams, Dept. of Justice (Vicki A. O'Meara, Acting Asst. Atty. Gen., Washington, DC, Tony Graham, U.S. Atty., Oklahoma City, OK, Steven Mullins, Asst. U.S. Atty., Tulsa, OK, John A. Bryson, Dept. of Justice, Jean Rogers, Office of Sol., with her, on the brief), Washington, DC, for defendant-appellee James B. Busey.
 Dennis R. Box, Williams, Box, Forshee, Synar & Bullard, Oklahoma City, OK (Cydney Campbell, Williams, Box, Forshee, Synar & Bullard, Oklahoma City, OK, Mary Ann Karns, City Atty., Stillwater, OK, with him, on the brief, for City of Stillwater, Norman N. Hill, Gen. Counsel, Oklahoma City, OK, with him, on the brief, for OK Dept. of Transp.), for defendants-appellees OK Dept. of Transp. and City of Stillwater.
 Before BALDOCK, HOLLOWAY, and BRORBY, Circuit Judges.
 BRORBY, Circuit Judge.
 
 
 1
 This appeal stems from the proposed federal funding of a four-lane highway through Boomer Lake Park in Stillwater, Oklahoma. The Committee to Preserve Boomer Lake Park alleges the Federal Highway Administration's decision to fund the highway violated Sec. 4(f) of the Transportation Act, and further alleges the agency's decision not to conduct an environmental impact statement was erroneous.
 
 Background
 
 2
 Boomer Lake Park is a 347-acre, municipally owned park in Stillwater, Oklahoma of which Boomer Lake comprises roughly 220 acres. Lakeview Road, an east-west route through the City of Stillwater, was a narrow, two-lane street with a one-lane bridge. The road's alignment followed a city section line until it intersected the southern part of Boomer Lake, whereupon the road turned south along the lake, then east over the Boomer Lake Dam, and then back north before returning to its original east-west alignment. In 1978, an inspection of Boomer Lake Dam revealed certain structural deficiencies which required the dam to be rebuilt. The portion of Lakeview Road on top of the old dam was demolished during the dam's reconstruction and due to concerns that traffic would cause structural stress to the new dam, Lakeview Road was not replaced on top of the dam.
 
 
 3
 The subject of this litigation is the reconstruction of Lakeview Road. After several public informational hearings, the Stillwater City Commission decided to rebuild Lakeview Road on an elevated causeway and bridge across Boomer Lake. The proposed alignment envisioned widening Lakeview Road into a four-lane undivided road which would follow the section line in a direct route across the lake, thus eliminating four curves in the original route, two of which were substandard and made ninety-degree turns. The proposed roadway was deemed a vital part of the city-wide transportation plan's "middle loop." The purpose of the project, in addition to replacing the section of road destroyed with the old dam, was to eliminate congestion and accommodate present and projected traffic needs by providing a major east-west arterial route through the city. Traffic safety and fire department response times were also factors in the project's design. The proposed construction, however, would cross the lake and park, taking up approximately 3.3 acres of land in Boomer Park and another 2.4 acres of Boomer Lake for the causeway and bridge.[1] After conducting a cost analysis on the project and after holding more public hearings, the City Commission again voted in favor of the straight alignment across the lake.
 
 
 4
 In 1988, the Oklahoma Department of Transportation (ODOT) requested federal highway funds from the Federal Highway Administration (FHWA) for the reconstruction of Lakeview Road. The ODOT solicited comments from local, state and federal agencies concerning the possible social, economic and environmental effects of the proposed Lakeview Road project. The ODOT initially submitted a draft Environmental Assessment (EA) and Sec. 4(f) statement concerning the project which was rejected by the FHWA for failing to consider an alternative, in addition to a no-build alternative, which completely avoided the park. A second draft was submitted, hereinafter referred to as the EA/4(f) statement, which compared three alternatives: (1) a no-build alternative; (2) a four-lane road with a straight alignment across Boomer Lake built upon a causeway and bridge (the causeway alternative); and (3) a four-lane road with an alignment around the southern end of Boomer Lake and the park (the avoidance alternative). The avoidance alternative consisted of a southwesterly diversion from Lakeview Road's current alignment to a point approximately 850 feet south of the section line and roughly 500 feet south of the dam.[2] The alternative then paralleled the section line roughly 1,500 feet before turning northeast onto an existing road which eventually rejoined Lakeview Road west of Boomer Lake. The FHWA accepted the new document and after a public hearing, found there was no prudent and feasible alternative to the proposed use of parkland under Sec. 4(f) of the Transportation Act. The FHWA also issued a finding of no significant impact (FONSI) under the National Environmental Policy Act (NEPA), 42 U.S.C. Secs. 4321-4347 (1988).
 
 
 5
 Six Stillwater residents living in the vicinity of Boomer Lake Park formed the Committee to Preserve Boomer Lake Park (the Committee) and filed a lawsuit in district court challenging the FHWA's decision to provide federal funds for the road project and its decision not to prepare an environmental impact statement (EIS). The district court, in a factually detailed, twenty-nine-page order, granted the defendants' motion for summary judgment. The court held that under Sec. 4(f) of the Transportation Act, "the FHWA could have reasonably believed that all of the alternatives to the proposed project while ... arguably feasible, were not prudent and presented unique or uniquely difficult problems." The district court also held that the FHWA's decision to issue a FONSI was not arbitrary and capricious and the Committee failed to allege any substantial environmental issues omitted from the Agency's consideration.
 
 
 6
 On appeal, the Committee alleges the FHWA violated Sec. 4(f) of the Transportation Act by approving the use of federal funds for a highway project which involves the destruction of parkland. The Committee also alleges the FHWA was required to prepare an EIS and the decision to issue a FONSI was arbitrary and capricious.
 
 Analysis
 
 7
 The Committee challenges the district court's decision to grant summary judgment under both Sec. 4(f) and NEPA by asserting that genuine issues of material fact exist. Under Fed.R.Civ.P. 56(c), summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The party opposing summary judgment "may not rest upon ... mere allegations or denials ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Lake Hefner Open Space Alliance v. Dole, 871 F.2d 943, 945 (10th Cir.1989). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The materiality of a factual dispute is identified by the governing substantive law and a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S.Ct. at 2510.
 
 I. Section 4(f)
 
 8
 The Committee alleges the FHWA violated Sec. 4(f) of the Transportation Act in approving the use of federal funds to construct a highway that would use parkland. Section 4(f) of the Transportation Act, 49 U.S.C. Sec. 303(c) (1988) states:
 
 
 9
 [t]he Secretary [of Transportation] may approve a transportation program or project ... requiring the use of publicly owned land of a public park [or] recreation area ... only if--
 
 
 10
 (1) there is no prudent and feasible alternative to using the land; and
 
 
 11
 (2) the program or project includes all possible planning to minimize harm to the park [or] recreation area ... resulting from the use.
 
 
 12
 A virtually identical provision is contained in the Federal-Aid Highways Act, 23 U.S.C. Sec. 138 (1988).[3]
 
 
 13
 Our interpretation of these provisions is guided in part by the Supreme Court decision in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Overton Park instructed reviewing courts to conduct a three-tiered inquiry of the Secretary of Transportation's decision to fund a highway across land covered by Sec. 4(f). First, the reviewing court is "required to decide whether the Secretary acted within the scope of his authority" under Sec. 4(f). Id. at 415, 91 S.Ct. at 823. In this initial inquiry, we "must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems." Id. at 416, 91 S.Ct. at 823. Second, the court must decide whether the Secretary's ultimate decision was " 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.' " Id. (quoting 5 U.S.C. Sec. 706(2)(A) (1964 ed., Supp. V)). This inquiry involves determining "whether the [Secretary's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. Finally, the Supreme Court instructs reviewing courts to determine "whether the Secretary's action followed the necessary procedural requirements." Id. at 417, 91 S.Ct. at 824. In reviewing the district court's conclusion to uphold the agency's decision, we apply the above inquiry without deference to the district court. Arizona Past & Future Found., Inc. v. Lewis, 722 F.2d 1423, 1425-26 (9th Cir.1983). Our review must be probing and thorough, but "the Secretary's decision is entitled to a presumption of regularity." Overton Park, 401 U.S. at 415, 91 S.Ct. at 823.
 
 A. Prudent and Feasible Alternatives
 
 14
 The Committee alleges the administrative record is devoid of any discussion on why the alternative routes were not prudent and feasible and thus claims the Secretary did not act within the scope of his authority pursuant to Sec. 4(f). We address this claim under the first Overton Park inquiry.
 
 
 15
 The Secretary of Transportation may only approve federal funding of a highway through parkland if "there is no prudent and feasible alternative." 49 U.S.C. Sec. 303(c). There is no "feasible" alternative if "as a matter of sound engineering it would not be feasible to build the highway along any other route." Overton Park, 401 U.S. at 411, 91 S.Ct. at 821. Such a determination provides for little administrative discretion. Id. The term "prudent," in contrast, involves a common sense balancing of practical concerns, but Sec. 4(f) requires the problems encountered by proposed alternatives to be "truly unusual" or "reach[ ] extraordinary magnitudes" if parkland is taken. Id. at 413, 91 S.Ct. at 822. Thus, although costs and community disruption should not be ignored in the balancing process, the protection of parkland is of paramount importance.[4] Id. at 412-13, 91 S.Ct. at 821-22. Because the government does not suggest that the alternative routes were infeasible, we limit our review to whether the alternatives were imprudent.
 
 
 16
 The EA/4(f) statement set forth a number of reasons why the alternatives were imprudent. The EA/4(f) statement analyzed projected traffic volumes and the ability of the avoidance and causeway alternatives to accommodate the traffic. From a traffic analysis standpoint, the causeway alternative was deemed the "best and only alternative." Overall, when the avoidance route was compared to the causeway alternative, the avoidance route was found to have the following problems: (1) higher road user costs; (2) more traffic congestion; (3) substandard curves which in turn raised safety concerns; (4) failure to accommodate east-west traveling opportunities as well as a direct route across the lake; (5) more intersection modifications on existing roads; (6) more commercial and residential relocations; and (7) higher construction cost. Similarly, the no-build alternative, by failing to connect Lakeview Road, was considered worst with respect to problems 1-4, and was thought to "eliminate a vital section line road that links the east and west sides of Stillwater." Additionally, the causeway route was deemed beneficial by providing better fishing access, improving water quality,[5] and connecting the east and west sides of the park (the road was designed to include a walkway/bikeway parallel to the road).
 
 
 17
 We believe the record indicates the Secretary acted within the scope of his authority and could reasonably have believed the alternatives involved unique problems which rendered them imprudent. The inability of an alternative to accommodate future traffic volumes is justification for rejecting that alternative. Lake Hefner, 871 F.2d at 947; see also Hickory Neighborhood Defense League v. Skinner, 910 F.2d 159, 164 (4th Cir.1990) ("alternatives which will not solve or reduce existing traffic problems may properly be rejected by the Secretary as not prudent"). Similarly, if an alternative does not satisfactorily fulfill the purposes of the project, which in this case included providing an east-west transportation route through town, then the alternative may be rejected. Arizona Past & Future Found., 722 F.2d at 1428. Safety and cost concerns are also valid considerations in rejecting an alternative. See Eagle Found., Inc. v. Dole, 813 F.2d 798, 804, 810 (7th Cir.1987). Although none of these factors alone is clearly sufficient justification to reject the alternatives in this case, their cumulative weight is sufficient to support the Secretary's decision. See Hickory Neighborhood Defense League, 910 F.2d at 163 ("A cumulation of small problems may add up to a sufficient reason to use Sec. 4(f) lands") (citing Eagle Found., 813 F.2d at 805).
 
 
 18
 The Committee also expressed concern that "the words 'feasible and prudent' were [not] used repeatedly in the environmental documents." This fact causes us little concern. The FHWA found the environmental documents to "contain[ ] sufficient information on which to base [its] determination that there [was] no feasible and prudent alternative." (Emphasis added.) The mechanical use of such language in the supporting documents is unrelated to the documents' substantive merit. Cf. Skinner, 910 F.2d at 162 (holding it unnecessary for the Secretary to use the terms "unique" and "extraordinary" in the Sec. 4(f) analysis).
 
 B. Relevant Factors in Secretary's Decision
 
 19
 The Committee raises numerous arguments which invoke the second Overton Park inquiry by questioning whether the Secretary of Transportation properly considered all of the relevant factors in making his decision to fund the project. Under part two of the Overton Park inquiry, this court "must consider whether the [Secretary's decision] was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416, 91 S.Ct. at 824. Thus, if a relevant factor was overlooked, summary judgment would be improper if the factor is such that a reasonable jury could return a verdict in favor of the Committee. See Liberty Lobby, 477 U.S. at 246, 106 S.Ct. at 2509. We are instructed to conduct a careful and searching inquiry into the facts, but once we are satisfied the Secretary took a "hard look" at the relevant factors, we are not to substitute our judgment for that of the agency. Id.; Eagle Found., 813 F.2d at 803.
 
 
 20
 One of the factors which the Committee claims should have been considered by the Secretary was a two-lane parkland avoidance alternative. The alternative recommended by the Committee would follow the same alignment as the four-lane parkland avoidance alternative already considered. Under the facts of this case, we hold it was not necessary for the Secretary to examine this alternative.
 
 
 21
 In general, the Secretary's obligation under Sec. 4(f) is to examine enough alternatives "to permit a sound judgment that the study of additional [alternative routes] is not worthwhile." Eagle Found., 813 F.2d at 807. Although the existence of an unexamined yet viable alternative route that avoids the acquisition of parkland may form the basis for reversing the Secretary's decision, Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 784-85 (9th Cir.1980), the decision concerning which alternatives to consider is necessarily bounded by a rule of reason and practicality. See Skinner, 910 F.2d at 164 (applying " 'rule of reason and practicality' ... [in determining whether] the Secretary complied with the mandates of section 4(f)"); see also Druid Hills Civic Ass'n v. Federal Highway Admin., 772 F.2d 700, 713 (11th Cir.1985) (under NEPA, the extent to which various alternatives are considered is bounded by a rule of reason).
 
 
 22
 The Committee fails to allege any facts to suggest that a two-lane parkland avoidance alternative would somehow rectify the deficiencies of the four-lane alternative already considered. Common sense would indicate that the proposed two-lane alternative would be less suitable in serving projected traffic volumes than a four-lane alternative of the same alignment. The Committee claims that its proposed two-lane parkland avoidance alternative would minimize harm to the park, yet nothing in the record indicates the four-lane parkland avoidance alternative was considered harmful to the park.[6] Although a two-lane alternative would likely cost less to build and possibly require less business or residential relocations, these are not arguments made by the Committee. There is nothing in the record indicating it was arbitrary and capricious for the Secretary not to consider a two-lane version of the four-lane parkland avoidance alternative.
 
 
 23
 The Committee also alleges the Secretary failed to consider the adequacy of roads already in existence when it rejected the no-build alternative. Specifically, the Committee alleges the availability of Airport Road and Hall of Fame Avenue were important factors overlooked by the Secretary.
 
 
 24
 After careful review of the record, we believe the environmental documents supporting the Secretary's decision contemplate the relevant, east-west thoroughfares already in existence. One mile south of Lakeview Road is another east-west section line, McElroy Avenue. McElroy Avenue contains four lanes in areas, but is a narrow two-lane road in the western half of town. The record indicates that McElroy Avenue was considered inadequate because constraints caused by Oklahoma State University and residential frontage made it highly unlikely the road would ever be widened into four lanes. The Committee does not challenge this conclusion.
 
 
 25
 One mile north of Lakeview Road is another east-west section line, Airport Road. The record indicates that Airport Road was considered inadequate because it terminates at the Airport and "will always remain discontinuous as an east-west section line arterial." The Committee alleges that a recently initiated project will make Airport Road an adequate crosstown route by extending Western Road north from Lakeview Road to the western terminus of Airport Road. Although the new project was initiated after the Sec. 4(f) determination and FONSI were issued, the project had been planned for some time.[7]
 
 
 26
 Although the FHWA's failure to consider the new Airport Road project was a material fact, the oversight is not sufficient to cause a reasonable trier of fact to find the Secretary's decision arbitrary and capricious in this case. The new road project does not change the fact that Airport Road's east-west route is interrupted by the airport. For Airport Road to replace Lakeview road as an east-west arterial route through the City of Stillwater, traffic driving along Lakeview Road would be required to turn north one mile to Airport Road, drive to the airport, then turn south one mile back to Lakeview Road. We fail to see how such a circuitous route would satisfy the goals of the Lakeview Road project without falling victim to the same problems that doomed the parkland avoidance alternative, and the Committee offers no evidence to suggest the Airport Road project would satisfy projected traffic volumes. As we stated earlier, mere allegations are insufficient to establish a genuine issue for trial. Moreover, the City of Stillwater did not find Airport Road adequate by itself to handle the City's traffic as the City's transportation plan envisioned both the Lakeview and Airport Road projects. Thus, although the failure to consider the Airport Road project was a relevant factor which should have been considered, it is not sufficient reason to reject summary judgment.
 
 
 27
 Similarly, the Secretary's failure to consider the availability of Hall of Fame Avenue does not necessitate a remand. Hall of Fame Avenue is an east-west road south of McElroy Avenue. As with Airport Road, Hall of Fame does not provide a complete east-west route through the City, but would need to be used in conjunction with major north-south arteries. For the same reasons as Airport Road, such a circuitous east-west route would be less suitable than the rejected avoidance alternative in accommodating projected traffic volumes and the Committee presents no evidence to the contrary. Moreover, Hall of Fame Avenue is more than a mile south of Lakeview Road, and more than two miles south of Airport Road and thus would provide little relief for Lakeview Road traffic. For these reasons, it is clear the Secretary did not abuse his discretion by failing to consider Hall of Fame Avenue.
 
 
 28
 The Committee also argues that the increase in the estimated cost of the avoidance alternative which took place between the draft EA/4(f) statement which was rejected and the final EA/4(f) statement was in bad faith, and the bad faith was a relevant factor which the Secretary should have considered. We agree with the district court in its conclusion that the record fails to support the Committee's allegations. In the record, the project manager said the higher cost calculated for the avoidance alternative in the final EA/4(f) statement was due to the alternative's changed alignment which involved higher costs for purchasing the land. The increased cost also purportedly reflected a revised cost estimate using the most current pricing information. The Committee's assertions to the contrary are merely conclusory allegations which are insufficient to reverse summary judgment.
 
 C. Disputed Factual Findings
 
 29
 The Committee makes numerous factual allegations which essentially assert that the record does not support the Secretary's decision. Such claims fall within either the first Overton Park inquiry, where we must determine whether the Secretary could reasonably believe there was no prudent and feasible alternative, Overton Park, 401 U.S. at 416, 91 S.Ct. at 823-24, or under the second inquiry, where we are instructed to apply the arbitrary and capricious standard of review to the Secretary's decision. Id. The Committee believes that by raising these claims, it has asserted genuine issues of material fact which preclude summary judgment.
 
 
 30
 For example, the Committee challenges the method used to project traffic volumes for the avoidance alternative. Specifically, the Committee argues "it is not state of the art practice to prepare a traffic volume forecast for the causeway route and then ... use the same forecast for the parkland avoidance alternative." The Committee's expert argues that the parkland avoidance alternative should be evaluated in light of the smaller traffic demand it would accommodate due to the capacity problems inherent in its design. In contrast, the traffic engineering consultant who prepared the traffic report for the City of Stillwater said the Committee's proposed method is not the generally accepted practice.
 
 
 31
 A disagreement among experts or in the methodologies employed is generally not sufficient to invalidate an EA/4(f) statement. Arizona Past & Future Found., 722 F.2d at 1428. Courts are not in a position to decide the propriety of competing methodologies in the transportation analysis context, but instead, should determine simply whether the challenged method had a rational basis and took into consideration the relevant factors. Druid Hills, 772 F.2d at 711. After reviewing the record, it is apparent the method used in the EA/4(f) statement had a rational basis and examined the relevant factors. By comparing the alternatives based upon the same projected existing and future traffic demands, capacity problems inherent in either alternative become evident. The fact that the Committee does not agree with this method is insufficient to raise a material fact.
 
 
 32
 Another disputed factual issue raised by the Committee involves the road-user costs. The EA/4(f) statement estimated that the road-user costs associated with the parkland avoidance alternative would be $730,000 more than for the causeway alternative. After reviewing the record, we find no substantiation for this estimate.
 
 
 33
 Unsubstantiated determinations or claims lacking in specificity can be fatal for an EA/4(f) statement. Preparation of EA/4(f) statements would be rendered meaningless if they were merely a vehicle for conclusory, self-serving findings. Such documents must not only reflect the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project, but also provide a reviewing court with the necessary factual specificity to conduct its review. Although the EA/4(f) statement is not a model of clarity, we believe under the circumstances of this case, it is sufficiently adequate.
 
 
 34
 The unsubstantiated dollar figure given for the expected increase in road-user costs was only one of many problems associated with the avoidance alternative. Even without the road-user cost estimate, there is ample evidence to support the Secretary's decision that the alternatives were imprudent. Moreover, although the precise figure for road-user costs is unsubstantiated, it is reasonable to infer that the road-user cost for the avoidance alternative would be higher due to increases in the distance and time travelled, more curves and interchanges, and a higher accident rate. For these reasons, we do not believe the lack of substantiation and specificity as to the road-user costs was sufficient to allow a reasonable trier of fact to find the FHWA's rejection of the avoidance alternative arbitrary and capricious.II. NEPA
 
 
 35
 We next address the Committee's allegations concerning violations of NEPA. NEPA requires agencies to prepare a detailed statement of the environmental impact of any "major Federal action[ ] significantly affecting the quality of the human environment."[8] 42 U.S.C. Sec. 4332(2)(C). The Council on Environmental Quality (CEQ) has promulgated regulations to be followed by agencies in deciding whether to prepare an environmental impact statement (EIS) under NEPA. See 40 C.F.R. Secs. 1500.1, 1501.4 (1992); see also, 42 U.S.C. Secs. 4332(2)(B), 4344. These regulations allow agencies to conduct an environmental assessment (EA) in order to decide whether an EIS or a FONSI is appropriate.[9] 40 C.F.R. Secs. 11501.4(b), 1508.9 (1992). The CEQ regulations allow agencies to adopt their own procedures which supplement and help promulgate the CEQ regulations. 40 C.F.R. Sec. 1507.3 (1992). The Department of Transportation adopted such a procedure in Order 5610.1C.
 
 
 36
 Before addressing the Committee's contentions, it is helpful to understand the purpose of NEPA. "NEPA has twin aims. First, it 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.' Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983) (citations omitted). Agencies are not, however, required "to elevate environmental concerns over other appropriate considerations," but instead, are required to "take a 'hard look' at the environmental consequences before taking a major action." Id. NEPA is essentially procedural in that it does not require major federal actions to have no significant environmental impact, it only requires that the environmental impacts be considered in the decision process. See Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 499-500, 62 L.Ed.2d 433 (1980) (per curiam).
 
 A. CEQ Regulations and Order 5610.1C
 
 37
 The Committee alleges that the failure to conduct an EIS violated the CEQ regulations and Order 5610.1C. CEQ regulations require federal agency procedures to identify classes of action which normally do or do not require an EIS. 40 C.F.R. Sec. 1501.4(a) (1992). See also 40 C.F.R. Sec. 1507.3. In accordance with CEQ regulations, Order 5610.1C states that "[a]ny action having more than a minimal effect on lands protected under section 4(f) of the DOT Act will normally require the preparation of an environmental statement." Order 5610.1C Sec. 12(a). It is the Committee's contention that Order 5610.1C and the CEQ regulations require an EIS be completed in this case. The Committee relies primarily upon the language in 40 C.F.R. Sec. 1501.4(a) and (b). Subsection (a) of Sec. 1501.4 instructs an agency that in determining whether to prepare an EIS, the agency must determine whether the proposal is one which under its own regulations, would normally require an EIS or normally not require an EIS. Subsection (b) then states that "[i]f the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment." The Committee thus concludes that since the proposal is one which normally requires an EIS, an EA was inappropriate.
 
 
 38
 The Committee's interpretation of Order 5610.1C and the CEQ regulations is erroneous on several grounds. First, the language which the Committee relies upon in 40 C.F.R. Sec. 1501.4 does not prohibit a FONSI in this instance. The regulation only states that if the proposed action is not of a type which the agency has determined either will or will not normally require an EIS, then an EA should be conducted. This does not mean an EA and FONSI are never appropriate if an agency normally requires an EIS for a certain class of action. Second, Order 5610.1C does not state that all highway projects involving Sec. 4(f) land require an EIS, instead, it states that those projects "having more than a minimal effect" on Sec. 4(f) lands "will normally require" an EIS. Order 5610.1C Sec. 12(a).[10] Thus, since the FHWA found there would be no significant impact, this is arguably not a project which normally requires an EIS because it will not have "more than a minimal effect." Finally, it is clear the CEQ regulations contemplate a FONSI being issued without completing an EIS, even if the project is one which "normally" requires an EIS. Pursuant to 40 C.F.R. Sec. 1501.4(e) (1992), an agency may issue a FONSI if it determines on the basis of an EA that an EIS is not necessary, and
 
 
 39
 [i]n certain limited circumstances ... the agency shall make the finding of no significant impact available for public review ... before the agency makes its final determination whether to prepare an environmental impact statement ... [if]
 
 
 40
 (i) [t]he proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency....
 
 
 41
 40 C.F.R. Sec. 1501.4(e)(2) (1992). It is apparent from this regulation that actions which an agency determines will normally require an EIS, do not always require an EIS.[11] Thus, the FHWA was not required by law to complete an EIS.
 
 B. Finding of No Significant Impact
 
 42
 The Committee's final contention is that the FONSI was improperly issued because the highway "would necessarily have a significant effect on the human environment of Boomer Lake and Park" and, therefore, an EIS was required.
 
 
 43
 An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review. Village of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970, 972-73 (10th Cir.) (en banc), cert. denied, --- U.S. ----, 113 S.Ct. 59, 121 L.Ed.2d 27 (1992); see Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374, 376, 109 S.Ct. 1851, 1859, 1860, 104 L.Ed.2d 377 (1989) (applying the arbitrary and capricious standard to the analogous decision of whether to prepare a supplemental EIS). By challenging the FONSI, it is the Committee's burden to establish the agency's decision as arbitrary and capricious. Sierra Club v. Lujan, 949 F.2d 362, 369 (10th Cir.1991); Park County Resource Council, 817 F.2d at 621. In our review, we " 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.' " Oregon Natural Resources Council, 490 U.S. at 378, 109 S.Ct. at 1861 (quoting Overton Park, 401 U.S. at 416, 91 S.Ct. at 823-24).
 
 
 44
 The Committee contends the FHWA failed to take a hard look at the adverse environmental effects associated with the highway's construction. The Committee focuses on two types of impacts on Boomer Lake Park: (1) increased noise and visual clutter due to traffic which in turn would affect recreational and passive activities in the park; and (2) the causeway would bifurcate the lake, preventing sailboats and windsurfers from navigating the entire length of the lake, and creating a visual barrier to views of the dam and northern portion of the lake.
 
 
 45
 A review of the EA/4(f) statement reveals that the FHWA considered the claims now raised by the Committee. The EA/4(f) statement included a detailed noise pollution analysis, and although the analysis focused primarily upon the impact to local residences, the statement did note that there would be an increase in noise levels in a small section of the park. The EA/4(f) statement did not analyze the visual impact of the causeway in any detail, but did note that although some park users may consider the causeway and its traffic aesthetically displeasing, it would appear much like it did when the road was located on the dam except that it would be somewhat closer to the majority of the park. As for the Committee's claim concerning boat passage under the bridge, the record indicates the bridge would allow small boats to pass underneath, and although the area available for boating would be slightly diminished due to displacement by the causeway, the "difference should not significantly hamper this activity." Thus, since the FHWA considered the environmental impacts of the proposed highway, including the issues raised by the Committee, the decision to issue a FONSI was properly "based on a consideration of the relevant factors," Oregon Natural Resources Council, 490 U.S. at 378, 109 S.Ct. at 1861, and the Committee failed to raise a genuine issue of material fact.
 
 
 46
 The only question remaining is whether the FHWA's decision not to prepare an EIS was "a clear error of judgment." Id. The EA/4(f) statement examined the effect of the causeway alternative on a variety of environmental factors including erosion and soil conservation, air quality, water quality, noise pollution, and wildlife and endangered species. The proposed project also included measures to control erosion and improve water quality. See Park County Resource Council, 817 F.2d at 621 (measures implemented to mitigate potential environmental consequences are a factor to consider in reviewing an agency's decision not to prepare an EIS). The EA/4(f) statement's discussion of the proposed project and its alternatives indicates that the agency took a "hard look" at the environmental implications of the project and found there would be no significant impact.[12] The Committee's claims of adverse environmental effects are at best speculative and fails to convince us that the FONSI was clearly in error.
 
 
 47
 We AFFIRM the district court.
 
 
 
 [1]
 To mitigate the taking of 3.3 acres of parkland, the City of Stillwater provided 3.3 acres of equivalent land on Whittenberg Lake for public recreational use. The National Park Service agreed the land at Whittenberg Lake was equivalent to the value and usefulness of the Boomer Lake Parkland being taken
 
 
 [2]
 The record is unclear on how far south the avoidance alternative would detour. The EA/4(f) statement states that the alternative would be roughly 950 feet south of the dam, but elsewhere, the record indicates the alternative would be 850 feet south of the section line. After examining maps in the record, we conclude that the avoidance alternative's alignment would lie roughly 850 feet south of the section line, and thus approximately 500 feet south of the dam
 
 
 [3]
 The Committee does not allege the highway project failed to include the requisite planning to minimize harm, and instead focuses its claim on whether there was a prudent and feasible alternative
 
 
 [4]
 As indicated in Overton Park, highway projects will often be more direct in route, cost less, and involve less community disruption if built over parkland. "Thus, if Congress intended these factors to be on an equal footing with preservation of parkland there would have been no need for the statutes." Overton Park, 401 U.S. at 412, 91 S.Ct. at 821
 
 
 [5]
 The proposed causeway over the lake would purportedly enhance water quality by reducing the wind action on the lake which typically kept lake bottom sediments suspended in the lake's water column. Moreover, the causeway would be built on sediments dredged from the lake bottom. By dredging the lake, the depth of the lake is increased thus improving the water quality
 
 
 [6]
 In fact, the record indicates that the original draft EA/4(f) statement was rejected because the avoidance alternative considered in that statement used some parkland. The EA/4(f) statement which was ultimately accepted rectified the problem by considering an avoidance alternative which did not use parkland
 
 
 [7]
 The record indicates the Stillwater City Commission approved the Airport road project on April 2, 1990, and the 4(f) determination for the Lakeview Road project was made on July 1, 1991, and the FONSI for the Lakeview Road project was issued on September 9, 1991. Moreover, the Stillwater area transportation plan issued in 1988 placed the Lakeview Road project as a priority for the 1992-1993 fiscal year
 
 
 [8]
 The defendants do not assert that the proposed highway project is not a "major Federal action[ ]."
 
 
 [9]
 An EA is essentially a more concise and less detailed version of an EIS. One of the principal purposes of an EA is to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. Sec. 1508.9(a)(1) (1992). By conducting an EA, an agency considers environmental concerns yet reserves its resources for instances where a full EIS is appropriate. Park County Resource Council, Inc. v. United States Dept. of Agriculture, 817 F.2d 609, 621 (10th Cir.1987). The EA must "include brief discussions of the need for the proposal, of alternatives ..., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. Sec. 1508.9(b) (1992)
 
 
 [10]
 This is further demonstrated by Sec. 12(b) of Order 5610.1C which provides instructions on what is required if an EIS is unnecessary
 
 
 [11]
 It is undisputed that the procedures outlined in 40 C.F.R. Sec. 1501.4(e)(2) were complied with in this case
 
 
 [12]
 The FONSI is further supported by the fact that the new Lakeview Road's proposed route would be in close proximity to the old Lakeview Road's alignment. The environmental consequences of a proposed project should be viewed in light of the preexisting environment